IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2025 Session

## IN RE BENTLEY E.

**Appeal from the Chancery Court for Obion County**
**No. 35-195   W. Michael Maloan, Chancellor**

_____

### No. W2025-00391-COA-R3-PT
_____

Mother and Stepfather petitioned to terminate Father's parental rights. The trial court found two grounds for termination and that termination was in the child's best interest. This Court reversed the finding of grounds, but the Tennessee Supreme Court affirmed the ground of abandonment by failure to support and remanded the matter to the trial court for entry of additional findings as to the best interest analysis. On remand, the trial court again found that termination of Father's parental rights was in the child's best interest. Discerning no reversible error, we affirm

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CARMA DENNIS MCGEE and VALERIE L. SMITH, JJ., joined.

Randy N. Chism, Union City, Tennessee, for the appellant, Todd B.R.E.

David L. Hamblen, Union City, Tennessee, for the appellees, Brittany N.B., and Colby D.B.

### OPINION

#### I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves the parental rights of Respondent/Appellant Todd B.R.E. ("Father") to minor child, Bentley E.[1] The child was born to Father and Petitioner/Appellee Brittany N.B. ("Mother," and together with Father, "the parents") in December 2019. The

_____

[1] In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

parents were never married and separated in December 2020.

Father filed a petition to establish paternity and to set visitation and child support in the Obion County Chancery Court ("the trial court") in May 2021. Along with her answer, Mother moved to require Father to submit to a drug test. The motion was granted on May 16, 2022.

Mother married Petitioner/Appellee Colby D.B. ("Stepfather," and together with Mother, "Appellees") in January 2022. Appellees filed a petition for step-parent adoption and termination of parental rights in the trial court on September 19, 2022. As the grounds for termination, Appellees alleged abandonment by failure to visit and abandonment by failure to support; Appellees further alleged that termination of Father's rights was in the child's best interest.

Father eventually submitted to a ten-drug panel test in October 2022, testing positive for marijuana. Also in October 2022, Father filed a pro se opposition to the termination. He renewed his opposition through counsel in February 2023. Therein, as defenses to the allegations of abandonment, Father asserted that Appellees had prevented him from exercising visitation and that his attempt to set his child support obligation via the May 2021 petition remained unaddressed.

Father moved to require Stepfather to submit to a drug test, alleging that Mother had informed him that she and Stepfather had separated due to Stepfather's drug use. The trial court granted the motion on February 14, 2023. Three days later, Stepfather submitted to a ten-drug panel test, testing positive for marijuana.

The matter was heard in February 2023; the child was three years old. Mother testified that while she and Father were still together, he "was smoking marijuana every day" and would often spend a large portion of his free time with friends "getting high, drinking." She explained that Father was not interested in caring for the child, such that she would have to bring the child to work with her or else stay home because Father wanted to spend time with his friends and "refused to watch" the child.

Mother testified that Father saw the child a few times after the parents separated, but that she did not want to leave Father alone with the child based on his drug use. She explained that Father has never exercised overnight visitation with the child. Mother stated that the May 2021 petition to establish paternity and to set visitation and child support did not have any effect on Father's visitation schedule "because he was on drugs, and [she] did not feel comfortable letting Bentley go alone with him." Mother testified that she and Stepfather had separated for approximately two months in late 2021,[2] during which time

---

[2] Stepfather testified that the separation occurred shortly after the death of his grandmother, the person who raised him. He explained that he wanted this time alone to "figure out how to be a man by

Father had some visits with the child. These visits in December 2021 were the last time Father saw the child. Mother opined that the child would not recognize Father. Mother testified that Father had never paid any child support, and while Father's mother had occasionally provided diapers and other items for the child, Father had not.

Mother testified regarding an incident early in her relationship with Stepfather, where Father sent her text messages that he "wanted to shoot himself[.]"[3] Father also showed up at Mother's home and "choked [Stepfather] out." She testified that this was not the only time that Father had threatened violence against himself or against Mother.[4]

Appellees have a daughter together, born in 2022. Mother testified that Bentley was "basically [Stepfather's] first child." Mother testified that Stepfather is "always there" for the child, that he has "worked really hard" on his relationship with the child, and he and the child are "really attached." She opined that being adopted by Stepfather was in the child's best interest. Mother testified that her extended family is "[v]ery involved" with the child, with visits approximately every other week. Stepfather's father lives with Appellees and their children. Mother testified that Father's stepfather has not had a relationship with the child, and that she stopped letting Father's mother see the child because Father's mother "was so high on Xanax and Ambien[.]"[5] Mother testified that she would not trust anyone in Father's family to babysit the child "due to the drug use."

Stepfather testified that he loves Bentley, thinks of the child as his own son, and "just want[s] that boy to have a good life." Stepfather opined that adopting the child would be in the child's best interest, as Stepfather is "the only father figure that he's known," and "if that's what he believes and what he thinks, then that's the way it should be."

Stepfather explained that he used legal Delta-8 products occasionally during the day to stimulate his appetite and regularly at night to help him fall asleep. He testified that his use of these products caused him to test positive for marijuana.

Father testified that he saw the child "quite often" for several months after the parents separated, but he "really didn't get a lot of visitations" once Appellees moved in together in approximately May 2021. He did exercise three visits with the child in

---

[him]self, otherwise [he would] never be able to be one for anyone else."

[3] Specifically, Father's messages stated: "Its ok now [Mother] u win I leave all of my belongings to you and my son thank you for your time im parking the truck . . . so I can disappear Tell my son I love him and that daddy will be back someday"; the messages were accompanied by a picture of a handgun.

[4] Mother described one incident caught on video, in which Father threatened that he was "going to shoot all of us up," even with the child in the house. Two other videos were played at trial but not entered into evidence, one from 2019 was described as showing Father hold a pillow over Mother's face while she was pregnant with the child, and another in which Father yelled at the child, who was approximately four months old and crying. Father did not dispute the testimony describing these videos.

[5] During her testimony, Father's mother was asked only if she used marijuana, which she denied.

December 2021, when Mother briefly moved out of the residence shared with Stepfather. Father explained that he requested overnight visitation but Mother would not allow it. He testified that he contacted Mother every other week to attempt to visit with the child, and Mother would not respond to each message and would occasionally call him from a private number. He stated that he had contacted Mother to arrange visitation as recently as two or three weeks before Appellees filed their termination petition. Father testified that he last saw the child for forty-five minutes one day in March 2022; he stated that he brought Mother a big box of diapers and gave Mother the only cash he had in his wallet because she asked for money.

Father explained that he had paid no child support since the parents separated, "because it hasn't been required by the Court for [him] to . . . start paying it." He also stated that he was informed by the local child support office that this case needed to be resolved before that office could assist him. Still, Father testified that when asked by Mother, he would give her $40.00 to $80.00 dollars at a time, as well as boxes of diapers. Father testified that between December 2020 and December 2022, he had "probably given [Mother] maybe a thousand dollars" in cash and approximately three hundred dollars worth of supplies;[6] he explained that he did "realize that's not enough." Father also stated that he "was ready to pay child support if that's what had to be done for [him] to see [his] child." But he explained that he did not know Mother's current address and that Mother said that she had been instructed not to communicate with him. He further stated that Mother "could come by and get [child support] at any time. [He] wasn't going to chase her down on a wild goose chase."

Father testified that he initiated the proceedings in May 2021 to establish paternity and set child support and visitation because he "was tired of a woman being able to hold [his] child over [his] head the whole time." His attorney for these earlier proceedings died unexpectedly in late 2021, delaying additional efforts. Father testified that after he filed the petition, Mother offered him $3,000.00 to give up his rights to the child.[7]

Father testified that he did not submit to a drug test shortly after the May 2022 order because he "was scared if [he] popped positive for marijuana that [he] wouldn't get [his] child[.]" He also stated that he was helping his ailing grandmother at the time and could not afford an attorney after his initial counsel died. Father admitted to still using marijuana.

Father testified that he played an active role in caring for the child while the parents were together. He stated that he is more responsible and has a better living environment now than he was when the parents were newly separated. He explained that he was living with his mother and stepfather and their daughter. Father testified that "all [he] want[s] is

---

[6] During rebuttal, Mother testified that she had received maybe two hundred dollars from Father since their separation.

[7] Mother denied doing so.

- 4 -

[his] relationship with [his] son back."

Father's mother, father, and stepmother testified to having heard Mother deny Father visitation with the child. Father's father also testified to observing Father and the child together on a few occasions, stating that the interaction went well.

The trial court entered its order terminating Father's parental rights on May 11, 2023. The trial court found that Father had "only brief times of visitation" with the child between December 2021 and July 2022, and no visitation with the child after July 2022. The trial court further found that Father had provided diapers and small amounts of cash upon Mother's request in 2021 and 2022, but that he paid no child support after the parents separated in December 2020. Thus, the trial court concluded that Father had abandoned the child by both failure to visit and failure to support. Emphasizing Father's drug use and its finding that Father did not have a meaningful relationship with the child, the trial court concluded that termination of his parental rights was in the child's best interest. Father appealed the trial court's ruling to this Court on June 9, 2023.

Father then filed a Rule 60.02 motion to set aside judgment in the trial court on October 2, 2023, alleging that Appellees were separated, no longer residing together, and contemplating divorce. Father asserted his belief that "the events and activities leading to the separation and divorce . . . were ongoing at the time of the trial or occurred soon thereafter[,]" such that Appellees' testimony at trial concerning the family life and home environment of the child "amounted to misrepresentation of the facts[.]" He asserted that without this alleged misrepresentation, the trial court may not have terminated his parental rights. Father further argued that, "given the separation and contemplated divorce of [Appellees] so soon after the trial and entry of the final Judgment," adoption by Stepfather was no longer in the child's best interest and equity required the reversal of the trial court's judgment.

Appellees opposed Father's Rule 60.02 motion in February 2024, denying any misrepresentation of fact. Appellees admitted being separated and contemplating divorce but denied that the potential for divorce existed at the time of trial. Appellees further stated that they were continuing to co-parent the child despite their separation, such that the termination and adoption remained in the child's best interest.

Father's motion was denied by order of April 8, 2024. The trial court found that although Appellees admitted to separating in June 2023, Father had "presented no evidence that [Appellees] misrepresented their relationship to the court at the time of trial[.]"

On July 25, 2024, this Court reversed the trial court's termination of Father's parental rights, concluding that neither Father's failure to visit or failure to support had been willful. *See In re Bentley E.*, No. W2023-00846-COA-R3-PT, 2024 WL 3537790, at *6–7 (Tenn. Ct. App. July 25, 2024), *rev'd per curiam*, 703 S.W.3d 298 (Tenn. 2024).

Because no grounds for termination had been proven, analysis of the child's best interest was pretermitted as moot. *Id.* at *7.

Appellees appealed this ruling to the Tennessee Supreme Court. *See* ***In re Bentley E.***, 703 S.W.3d 298 (Tenn. 2024) (per curiam). The court relied on Mother's testimony that she did not want Father to have visitation and her unilateral control over when Father was able to see the child in determining that Father's failure to visit was not willful, and thus not a ground for termination. *Id.* at 302. However, the court concluded that Father had not adequately established that his failure to support was not willful, emphasizing his testimony that he knew he had not paid enough to support the child. *Id.* at 303. Thus, one ground for termination—abandonment by failure to visit—was reversed, while the second ground— abandonment by failure to support—was affirmed. The court further held that the trial court's order did not contain sufficient findings of fact and conclusions of law regarding the child's best interest. *Id.* at 303–04. As such, the Tennessee Supreme Court vacated the trial court's decision to terminate and remanded the matter for entry of a more detailed order concerning the child's best interest. *Id.* at 304. The court's ruling also included specific guidance as to three of the best interest factors:

> [U]pon remand, after our review of the grounds for termination and post-judgment facts, we conclude two of the factors are not applicable. We have determined that Mother prevented Father from visitation with the child and, therefore, . . . the absence of an attachment with the child and the failure to visit, should not be counted against Father. In addition, another factor, . . . that the child has a healthy attachment to Stepfather, should be reconsidered given that Stepfather and Mother admitted in their answer to Father's Tennessee Rule of Civil Procedure 60.02 motion that they were separated and in the process of getting a divorce. Although the trial court denied the Rule 60.02 motion, the documents are, nonetheless, in the record and should be considered upon remand.

*Id.* at 304–05.

Following a "thorough review of the entire record in the case," the trial court entered its judgment on remand on February 18, 2025. The order contained findings relating to each of the statutory best interest factors. The trial court noted the Tennessee Supreme Court's conclusion that factors (B) and (C) did not support termination based on the court's conclusion that Mother had interfered with Father's ability to visit and form a meaningful relationship with the child. As to factor (D), the trial court explained that Father's Rule 60.02 motion "was based on the allegation that [M]other and [S]tepfather were not truthful about their relationship" at trial, which the trial court found untrue. Because the proof at trial established that Stepfather has a meaningful relationship with the child, and no proof was introduced at the Rule 60.02 hearing "as to whether the separation had any effect" on this relationship, the trial court found "no proof in the record" requiring a reversal of its

earlier finding that the factor supported termination.[8] Ultimately, the trial court again concluded that clear and convincing evidence established that the termination of Father's parental rights was in the child's best interest.

## II. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

Because of the high burden of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court has explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under

---

[8] Appellees have filed a motion to consider post-judgment facts concerning the current state of their relationship.

Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

### III. ANALYSIS

Only one issue remains to be resolved by this appeal: whether Appellees have proven, by clear and convincing evidence, that termination of Father's rights is in the child's best interest. *See In re Angela E.*, 303 S.W.3d at 254 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (citing *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. App. June 26, 2006) (noting that "existence of a ground does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child"))). The factors that courts should consider in ascertaining the best interest of children include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (directing the court to "consider all relevant and child-centered factors applicable to the particular case before the court").[9]

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667 (citations omitted). As such, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (citing *White*, 171 S.W.3d at 194). In considering the statutory factors, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878). Here, the trial court found that while some factors did not support the termination of Father's parental rights, the "combined weight of all the relevant factors" established that termination was in the child's best interest.

Before we begin our analysis, we find it necessary to discuss some apparent confusion evident in the trial court's judgment on remand. We note that in its May 2023 order, the trial court listed only certain statutory factors as particularly relevant to its consideration of the child's best interest. While this list included items A through J, these identifications did not always correlate to the factor's statutory designation; for example, although item A in the trial court's order was indeed related to statutory factor (A), item B more closely resembles factor (D).[10]

---

[9] Effective April 22, 2021, this subsection was amended by deleting the entirety of the list of nine best interest factors and substituting a new list of twenty factors. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). Thus, petitions for termination filed on or after April 22, 2021, require the use of the amended factors in considering the best interests of the subject children. *See In re Jackson R.*, No. M2021-01545-COA-R3-PT, 2023 WL 353420, at *9 n.8 (Tenn. Ct. App. Jan. 23, 2023) (noting that "the amended statute applies only to petitions for termination filed on or after April 22, 2021"). In this case, the petition for termination and relative adoption was filed on September 19, 2022. Thus, the amended statutory best interest factors are applicable here.

[10] Specifically, the relevant portion of the trial court's initial order stated:

> B.    The father has not shown that he had a secure and healthy parental attachment to the minor child as the testimony was that the child would

- 10 -

On appeal, our supreme court ruled that certain factors "should not be counted against Father." *In re Bentley E.*, 703 S.W.3d at 305. In doing so, it named "the trial court's B and C factors, the absence of an attachment with the child and the failure to visit[.]" *Id.* at 304. It seems clear that the supreme court recognized the discrepancy in the trial court's labelling, as it referenced both the item's designation included in the trial court's order as well as the subject matter of the relevant statutory factor. *Compare* Tenn. Code Ann. § 36-1-113(i)(B) (involving the effect of a change in caretakers on the child's well-being) *with* Tenn. Code Ann. § 36-1-113(i)(D) (involving the security of the parent-child attachment); *compare* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs) *with* Tenn. Code Ann. § 36-1-113(i)(E) (involving visitation). Similarly, the court directed the reconsideration of "the trial court's D factor that the child has a healthy attachment to Stepfather," *In re Bentley E.*, 703 S.W.3d at 305, again including both the trial court's designation of the item and its actual subject matter. C*ompare* Tenn. Code Ann. § 36-1-113(i)(D) (involving the security of the parent-child attachment) *with* Tenn. Code Ann. § 36-1-113(i)(H) (involving the child's attachment to another parent-figure).

So then, it is evident that our supreme court directed that statutory factors (D) and (E) were not to be weighed against Father and that some reconsideration of factor (H) was required upon remand. Yet it seems that the trial court took these transposed identifications at face value, ruling in its February 2025 judgment that statutory factors (B) and (C) were inapplicable and statutory factor (D) was to be reconsidered.[11] The trial court's misunderstanding has been reflected in the appellate briefs of the parties, neither of which include any discussion of these factors. Our review of the facts in this case, however, would not classify factors (B) and (C) as inapplicable, but as favoring the termination of Father's parental rights.

Generally, ruling on an issue not raised on appeal "presents an especially strong risk of unfairness and prejudice, since the party who stands to lose on that issue would have no inkling that the issue was in play and therefore no reason to develop a record on the issue, research it, or address it in its briefs." *State v. Bristol*, 654 S.W.3d 917, 927 (Tenn. 2022). A possible resolution would therefore be to present the question of the applicability of factors (B) and (C) to the parties for additional briefing. *See id.* at 927–28. While we certainly recognize the important interests served by the "requirement that appellate courts give parties notice and an opportunity to be heard" before ruling on an issue, *id.* at 927, we

---

not even know the father if he were to meet the father;

C.     The father has not maintained regular visitation or other contact with the minor child; [and]

D.     The child has a healthy parental attachment to [Stepfather.]

[11] In its purported reconsideration of factor (D), the trial court focused on the child's relationship with Stepfather rather than with Father, which does align with the directive from the Tennessee Supreme Court. The result of this reassessment will be discussed more thoroughly, *infra*.

also keep in mind the statutory directive that "the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties[.]" Tenn. Code Ann. § 36-1-124(c); *see also In re Carrington H.*, 483 S.W.3d at 535 ("Appellate review of parental termination cases is expedited." (citing Tenn. R. App. P. 8A)); *State Dept. of Child.'s Servs. v. F.R.G.*, No. E2006-01614-COA-R3-PT, 2007 WL 494996, at *12 (Tenn. App. Feb. 16, 2007) ("A prompt and expedited conclusion to termination proceedings is essential to the child's welfare.").

Although we believe that consideration of factors (B) and (C) would buoy our assessment, we ultimately conclude that the analysis of the remaining statutory factors in light of the evidence presented at trial nevertheless "eliminates any serious or substantial doubt" that the child's best interest is served by the termination of Father's parental rights. *See In re Carrington H.*, 483 S.W.3d at 522. In the interest of both fairness to the parties and a prompt resolution to this matter, we will therefore limit our discussion to only those factors addressed by the trial court and the parties.

With that said, we turn to those factors the Tennessee Supreme Court specifically concluded do not weigh against Father. Factor (D) considers whether the parent and child have a meaningful relationship, and if not, whether it is reasonably expected that such a relationship could be formed in the future. Tenn. Code Ann. § 36-1-113(i)(D). Factor (E) likewise contemplates whether the parent has used regular visitation or other contact to form a positive relationship with the child. Tenn. Code Ann. § 36-1-113(i)(E). There is no question that Father did not exercise regular visitation with the child or that Father does not have a meaningful relationship with the child. However, after considering the entire period of time following the parents' separation, our supreme court found that the failure to visit resulted from Mother's interference. *In re Bentley E.*, 703 S.W.3d at 302. It stands to reason that if Father's lack of visitation was not willful, neither could his failure to establish a positive, meaningful relationship with the child through visitation be willful. Based on the supreme court's ruling, factors (D) and (E) "are not applicable" and therefore "should not be counted against Father." *Id.* at 304.

Often, the lack of meaningful relationship proves one of the most important elements in the determination of a child's best interest and the main thrust of Father's argument on appeal is that this non-attachment being the result of Mother's interference should be found equally significant, tipping the child's best interest against termination. *Cf. In re Addalyne S.*, 556 S.W.3d at 795 ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor; it is not error for a trial court to place similar weight on the fact that such a relationship exists."). But the analysis of a child's best interest requires a "fact-intensive inquiry" into "the circumstances of a particular child and a particular parent[.]" *In re Audrey S.*, 182 S.W.3d at 878 (citing *White*, 171 S.W.3d at 192, 194). And in this case, there are a few key factors that support the trial court's ruling that termination is in the

child's best interest, the consideration of each implicating several additional factors. *See In re Chayson D.*, 720 S.W.3d 123, 144 (Tenn. Ct. App. May 15, 2023) (noting that "significant overlap" exists between some factors based on their "overarching themes").

First of course, is factor (S), involving "[w]hether the parent has consistently provided more than token support for the child[.]" Tenn. Code Ann. § 36-1-113(i)(S). Although Father's failure to visit with the child was determined to be the result of Mother's interference, our supreme court did not find sufficient proof to establish that Father's failure to adequately support the child was similarly non-willful. *In re Bentley E.*, 703 S.W.3d at 303. Father emphasizes that no child support order was entered by the trial court following his May 2021 petition and that he was left without the advice of counsel after the death of his first attorney in November 2021. He argues that this proves that he was not "refusing to support his child, but rather waiting for guidance on the proper amount to be paid for his child support." This argument is simply without merit. *See In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017) ("[I]t is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place."). Father also stated that he "was ready to pay child support if that's what had to be done" to be able to exercise visitation with the child. This argument is similarly meritless. *See In re Audrey S.*, 182 S.W.3d at 864 ("The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially." (citations omitted)).

This lack of financial support also implicates our consideration of factor (P), involving "[w]hether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive[.]" Tenn. Code Ann. § 36-1-113(i)(P). On appeal, Father argues that he was unable to show the requisite understanding because Mother interfered with his ability to visit with the child. We accept that a lack of visitation could hinder Father's opportunities to meet certain of the child's more ephemeral needs, such as physical contact and verbal expressions of love and care. But children have material needs as well, and at trial, Father testified that he provided Mother with "maybe a thousand dollars" in cash and approximately three hundred dollars worth of supplies over the course of the two years between the parents' separation and the filing of Appellees' termination petition. Father admitted that he realized this was "not enough."

The second factor of particular importance here involves whether Father has effectively changed his circumstances to make it safe and beneficial for the child to be in his care and in his home. Tenn. Code Ann. § 36-1-113(i)(J); *see also* Tenn. Code Ann. § 36-1-113(i)(K) (involving the parent's use of available resources in making a lasting adjustment of circumstances). In considering whether a parent has created circumstances making it safe and beneficial for the child to be in the home, factor (J) specifically calls for courts to consider the use or abuse of alcohol and drugs within the parent's home. Mother

- 13 -

testified that Father was using marijuana daily during the parents' relationship, and that this drug use caused her to limit Father's contact with the child. And yet, Father admitted to continuing to use marijuana even at the time of trial.[12] It is clear that Father has failed to make any lasting adjustments to his circumstances in this regard.

Nor has much changed in relation to Father's living arrangement. We agree with Father that a person continuing to reside with their parents beyond the age of majority is not, on its own, cause for concern.[13] That Father lives with his mother, stepfather, and their daughter therefore does not necessarily impact the safety and stability of his home. *But see In re L.M.W.*, 275 S.W.3d 843, 850 (Tenn. App. 2008) (noting as part of its best interest analysis that the father "has not obtained a residence of his own but continues to live with

___

[12] Father attempts to argue on appeal that the trial court should have taken additional proof regarding the parties' current drug use, as well as expert proof regarding the distinction between marijuana and Delta-8, prior to issuing its judgment on remand. However, the record contains no such argument being made before the trial court, and Father did not include the trial court's alleged failure to take additional proof as an issue on appeal. The issue is therefore waived. *See Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006) ("Issues not raised in the trial court cannot be raised for the first time on appeal."); *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) (holding that "an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)"). Moreover, to the extent that Father asserts that additional proof should have been considered, nothing in the record demonstrates that he attempted to make an offer of proof to the trial court; as a result, we have no way to discern if the evidence Father sought to submit would have any effect on the analysis of the child's best interest. *See generally Hampton v. Braddy*, 270 S.W.3d 61, 65 (Tenn. Ct. App. 2007) ("Since we are unable to determine the substance of . . . [the excluded] testimony and whether that testimony would have affected the outcome of the trial, the failure of the defendant to make an offer of proof constitutes a waiver of the right to challenge the exclusion of this testimony." (citation omitted)). Even still, Father does not offer any assertion that he has not continued using marijuana.

Father further argues that more emphasis should have been placed on Stepfather's own failed drug test, particularly in light of the testimony of Father and Father's mother that Mother informed them that Appellees' separation resulted from Stepfather's use of Fentanyl. However, the trial court also heard Mother's testimony denying any such statement and the denial of illegal drug use by both Appellees, as well as Stepfather's testimony that he only uses legal Delta-8 products. The trial court was also presented with the results of both drug screenings, which indicated a concentration of "Carboxy-THC" in Stepfather's sample far below that of Father. As the allegations of illegal drug use were not held against Stepfather in either of the trial court's judgments, we can only infer that the trial court did not credit the allegations. *See Kautz v. Berberich*, No. E2019-00796-COA-R3-CV, 2021 WL 1034987, at *7 (Tenn. App. Mar. 18, 2021) ("To illustrate, if party (A) testified to (X), and party (B) testified to contrasting account (Y), and the trial court's order reflects that it believed (Y) to be the case, then one can discern that the trial court credited party (B)'s testimony rather than party (A)'s even if the court failed to make an explicit credibility determination."). We find nothing in the record to support reversing this determination. *Id.* ("We will not overturn a trial court's credibility determination—be it implicit or explicit—absent clear and convincing evidence to the contrary.").

[13] Father raises for the first time on appeal an argument that the trial court should have heard new evidence regarding his current living arrangement. Again, this issue was neither raised before the trial court nor included in his statement of the issues. Moreover, Father made no offer of proof to show what the substance of the newly offered evidence would be. As such, this argument is waived. *See Barnes*, 193 S.W.3d at 501; *Hodge*, 382 S.W.3d at 335; *Hampton*, 270 S.W.3d at 65.

- 14 -

his mother"). And indeed, we acknowledge that there was no testimony as to the child being fearful of living in Father's home or having any trauma related to living with Father.[14] *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home). Depending on the circumstances, this Court has classified a factor for which there was a lack of evidence as, variously, weighing against termination, being neutral, or being inapplicable. *See In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9–10 (Tenn. Ct. App. Jan. 21, 2025) (including a thorough discussion of the approaches taken in similar situations). Still, a factor that is merely neutral or inapplicable cannot be said to weigh in favor of termination.

Nevertheless, the testimony regarding his mother's abuse of Xanax and Ambien went unrebutted at trial, although she did deny using marijuana. Combined with his mother's misuse of medication, Father's continued drug use does not reflect a commitment to having a home environment suitable for the child. *See* Tenn. Code Ann. § 36-1-113(i)(Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home).

Moreover, Father admitted to using marijuana during the pendency of his petition for visitation, despite the trial court conditioning his ability to exercise visitation on his taking and passing of a drug test. As a result, Father not only delayed taking the test for several months, but when he finally submitted to the drug screen, he tested positive for marijuana. While Father's filing of the petition does reflect some sense of resolve, continuing to use an illegal drug despite knowing that it was a central obstacle to his ability to see his child does not reflect an urgent desire to remedy the circumstances making contact with the child unsafe. Tenn. Code Ann. § 36-1-113(i)(M) (involving the parent's sense of urgency). Additionally, Father spending money on his drug habit while not adequately supporting the child evinces a "me-first attitude" inconsistent with the emotional fitness necessary to safely care for the child. *See* Tenn. Code Ann. § 36-1-113(i)(T) (involving the effect of the parent's mental and emotional fitness on the child); *see also In re Jaydin A.*, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at *8 (Tenn. Ct. App. Dec. 12, 2019) ("Although no proof was specifically presented that a change in caretakers would be harmful to the child, common sense dictates that removing a child from the only family she has ever known and placing her with a stranger who has historically chosen to put his own desires ahead of the child's needs would cause harm to the child."). Nor do we find Father's statement that Mother should have simply "come by" Father's various places of employment to pick up his nominal support payments, and that he was not going to conduct a "wild goose chase" to bring her the money reflective of a genuine interest in effectively co-parenting the child. *See In re Lacie F.*, 2025 WL 2390613, at *7 (including as part of its analysis of these factors that the mother "did not

---

[14] However, this is likely due primarily to the child's young age and minimal contact with Father, and not evidence of any explicit feelings about Father's home.

see a need for adjustment or change of any kind on her part").

Further proof of this self-centered and immature attitude exists in the testimony regarding Father's violence and threats of violence against Mother and Stepfather, as well as the apparent threat of self-harm in the message to Mother. *See also* Tenn. Code Ann. § 36-1-113(i)(N) (involving any abuse or neglect present in the parent's home). Threatening violence against Bentley's caregivers does not indicate a parent focused on their child's well-being. Threatening violence against oneself also does not indicate a parent emotionally fit to safely care for such a young child.

Father's me-first attitude is similarly exposed by our analysis of his previous efforts to care for the child. *See* Tenn. Code Ann. § 36-1-113(i)(O) (involving the parent's prior provision of safe and stable care to any child). Despite Father's testimony to the contrary, the trial court credited Mother's testimony that Father refused to take care of Bentley by himself even when the parties were together, forcing Mother to take Bentley to her workplace, and that it was not safe for Father to care for the child during that time due to his drug use. *See **Kautz***, 2021 WL 1034987, at *7. The evidence does not preponderate against this credibility determination or the finding that Father made little effort to care for the child before the parents separated.

But of course, there can be no question that Stepfather has been a steady caregiver in the child's life. Tenn. Code Ann. § 36-1-113(i)(H) (involving the child's attachment to another parent-figure). As noted, *supra*, the Tennessee Supreme Court directed that factor (H) be reconsidered on remand, in light of the admission regarding the state of Appellees' relationship. Although the trial court mistakenly interpreted this mandate as requiring the review of factor (D), it considered the implication of Appellees' potential divorce on the child's relationship with Stepfather, which more closely aligns with factor (H). In any event, the trial court did not put any significant weight on Appellees' alleged separation, as it found no evidence in the record to suggest that the separation would negatively impact the child's best interest. The evidence does not preponderate against this finding. To the extent that the record contains proof of Appellees' separation following trial, there is still no evidence to suggest that the state of Appellees' relationship would alter the relationship between Stepfather and the child, as Stepfather remains a primary parent-figure in the child's life. The testimony was clear that the child has formed a meaningful attachment to Stepfather, who testified to viewing Bentley as no different from his child with Mother and further opined that termination of Father's parental rights would be in the child's best interest, as it would align the child's understanding of who his father is with legal reality.[15] *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's

---

[15] As the evidence does not preponderate against the trial court's finding that Appellees' separation was of little import to the analysis of the child's best interest, we find no reason to consider the post-judgment facts proffered by Appellees regarding the current status of their relationship. Appellees' motion is therefore, respectfully, denied.

- 16 -

need for stability); *see also **In re Aubrie W.***, No. E2019-00862-COA-R3-PT, 2020 WL 360504 (Tenn. Ct. App. Jan. 21, 2020) (holding that a change in caretakers would be detrimental to a child's emotional condition when the child bonded with her stepfather and does not know that her stepfather is not her biological parent). So too has the child formed strong bonds with the extended family of both Appellees, including Stepfather's father, who resides with Appellees, Bentley, and his half-sister. In contrast, the trial court found that there were no significant relationships with Father's extended family. Tenn. Code Ann. § 36-1-113(i)(I) (involving the child's relationships with others).

From our review, factors (A), (H), (I), (J), (K), (M), (N), (P), (Q), (R), (S), and (T) weigh in favor of terminating Father's parental rights. Factors (D) and (E) were found by the Tennessee Supreme Court to be inapplicable based on its conclusion that Mother interfered with visitation. Factors (B) and (C) similarly do not weigh against Father based on the parties' reliance on the trial court's mistaken application of the supreme court's ruling. And Factors (F), (G), and (O) were either supported by no proof or by both positive and negative proof so as to be neutral.[16] We do not recite these groupings as an indication of simply tallying those for and against termination. *See **In re Audrey S.***, 182 S.W.3d at 878 (prohibiting a "rote examination" of the factors). Instead, we seek to emphasize that very few factors favor Father on the bare merits of his actions.

To be sure, this Court has empathy for Father being prevented from exercising visitation. It was not Mother's role to determine whether Father could maintain regular contact with the child. *Cf. **In re Chelbie F.***, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *7 (Tenn. Ct. App. Apr. 27, 2007) (explaining that court orders are "designed to resolve disputes so that litigants do not resort to private remedies"). Yet we note that when the trial court placed its own limitations on Father's visitation by requiring a drug test, Father neither acted promptly in submitting to the testing, nor apparently at all, in curbing his drug use. So although the lack of visitation and meaningful relationship with the child do not count against Father, in this case these historically significant factors do not control our analysis of the child's best interest. *See **In re Braelyn S.***, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *21 (Tenn. App. July 22, 2020) (terminating the father's rights after noting that "[a]lthough more factors technically favor Father, they carry little weight in this case. To be sure, Mother stymied Father's relationship with the child, but when Father had opportunities to make progress in his desire to forge a relationship with the child, he failed to follow through.").

At this point in the analysis, we must focus on the best interest of the child, not the parent. *See **In re Gabriella D.***, No. E2016-00139-COA-R3-PT, 2016 WL 6997816, at *22 (Tenn. Ct. App. Nov. 30, 2016) (Stafford, J., dissenting) (explaining that "the focus of the best interest analysis is not to punish a parent for his or her historically bad behavior;

---

[16] As DCS was not involved in this case, Factor (L) is wholly inapplicable.

instead, the focus must center on what is best for the children at present and in the future"), *rev'd* 531 S.W.3d 662 (Tenn. 2017). We have previously held that it is often not in a child's best interest to be removed from a safe, stable caregiver to return to a parent who has not adjusted his or her "me-first attitude." ***In re Jaydin A.***, 2019 WL 6770494, at \*8. And here, Father's admitted provision of inadequate financial support for the child, continuing drug use, threats of violence against himself and others, and overall failure to put first the child's needs indicate that the child's best interest is not served by continuing the parent-child relationship. Thus, we must affirm the trial court's overall conclusion that Appellees presented clear and convincing evidence that termination was in the child's best interest.

## IV. CONCLUSION

The judgment of the Obion County Chancery Court is affirmed, and this matter is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant Todd B.R.E., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE